50 U.S. 471
 9 How. 471
 13 L.Ed. 220
 JOHN GOODTITLE, EX DEM. JOHN POLLARD, WILLIAM
POLLARD, JOHN FOWLER AND HARRIET, HIS WIFE, LATE
HARRIET POLLARD, HENRY P. ENSIGN AND PHEBE, HIS WIFE,
LATE PHEBE POLLARD, GEORGE HUGGINS AND LOUISA, HIS WIFE,
LATE LOUISA POLLARD, JOSEPH CASE AND ELIZA, HIS WIFE,
LATE ELIZA POLLARD, HEIRS AND LEGAL REPRESENTATIVES
OF WILLIAM POLLARD, DECEASED, PLAINTIFF IN ERROR,
v.
GAIUS KIBBE.
 January Term, 1850
 
 THIS case was brought up from the Supreme Court of Alabama, by a writ of error issued under the twenty-fifth section of the Judiciary Act.
 It involved the same principle decided by this court in the case of Pollard v. Hagan, reported in 3 Howard 212. It is not necessary, therefore, to set forth the facts and title any further than they are stated in the bill of exceptions which was taken to the opinion of the Circuit Court for Mobile County. The action of ejectment was brought by the lessee of Pollard's heirs in 1838, and was tried in 1845.
 Bill of Exceptions.
 On the trial of this cause the plaintiff produced the following grant:——
 'To the Commandant.
 'William Pollard, an inhabitant of this district, states to you with all respect, that whereas he has a mill situate on his place of abode, and frequently comes to this place with planks and property from his mill, therefore he wishes to have a situation favorable to the landing and safety thereof, and there being a vacant piece of ground at the edge of the water, between the canal called John Forbes's and the wharf of this place, he prays you to grant him said piece of ground at the edge of the water, the better to facilitate his business. A favor which he hopes to obtain from you.
 'WILLIAM POLLARD.
 December 11th, 1809.'
 'MOBILE, December 12th, 1809.
 'I grant to the petitioner the piece of ground which he asks for at the edge of the water, if it be vacant.
 'CAYETANO PEREZ.'The plaintiff next read the act of Congress, passed 26th May, 1824, entitled 'An act granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals in said city,' and an act of Congress of 2d July, 1836, entitled 'An act for the relief of William Pollard's heirs,' and a patent of the United States in pursuance of the said act, for the lot in controversy, to the lessors of the plaintiff; the plaintiff further proved, that, in the year 1813 or 1814, some wreck and drift wood was removed from the place where the premises in question now are, by the hands of William Pollard, the grantee.
 It was proved that in the year 1823, no one being then in possession, and the same being under water, Curtis Lewis, without any title, took possession of and filled up east of Water Street, and from it eighty feet east, and to the north of Government Street; that Lewis remained in possession about nine months, when he was ousted in the night by James Inerarity, one of the firm of Panton, Leslie, & Co., and of John Forbes & Co., its successor, claiming the land under the Spanish grant hereto attached, who improved the lot by the erection of a smith's shop. That shortly afterwards, Curtis Lewis recovered the possession under a forcible entry and detainer proceeding, and remained in possession for several years, during which he and Forbes & Co. were engaged in a lawsuit.
 The whole matter was terminated by the purchase, in 1829, by Henry Hitchcock, of the title of Forbes & Co., of Curtis Lewis, and of the Mayor and Aldermen of Mobile. Henry Hitchcock remained in the possession of the property till 1835, when he sold to the defendant for $28,000.
 The defendant produced the original Spanish grant and the English copy thereof, for the premises in dispute, with the certificate of confirmation, and produced the conveyances aforesaid, showing the title under which he claims.
 He proved that Panton, Leslie, & Co., and Forbes & Co., have had possession of the lot specified in their grant from its date; that they fulfilled the conditions which are specified therein; that to the east of the present site of Water Street, they had a canal extending into the river, through which their boats came up; that there was an embankment on both sides of this canal, on which their goods were landed, and from which their shipments were made. The fillings up done by Lewis were done by sinking flat-boats in this canal.
 The particular lots now sued for lie south of the canal and embankment aforesaid, and are between the king's old wharf and Forbes's canal; they lie to the east of Water Street, and fall within the lines laid down in the patent.
 The particular land in this writ was never improved until Curtis Lewis made the fillings up. It was further in proof, that previous to 1819, then, and until filled up, the lots claimed by plaintiff were at ordinary high tides covered with water, and mainly so at all stages of water; that the ordinary high tide at that time, flowing from the east, reached to about the middle of what is now Water Street. That in the Spanish times the eastern part of the lots to the west of Water Street was subject to be covered by water at ordinary tides by a flow of water from the river. That what is Water Street at this time was a natural ridge, which was not usually overflowed except at high tides; but there was a depression to the north of the lot of defendant, across which it flowed around upon the eastern parts of the lots lying to the west of the lots sued for. This ridge was about fifteen feet wide; Water Street was laid out in 1820, and is sixty feet.
 That no one had possession of the premises in question before 1826, except as before stated. The lines of the lot in the Spanish grant, being extended to the river, include the premises in dispute.
 It was further in evidence that Mr. Pollard died in 1816.
 TEST & PHILLIPS, for Plaintiff.
 J. A. CAMPBELL,
 STEWART & EASTON, for Defendant.
 And upon this evidence the court gave the following instructions to the jury, to wit:——
 'Plaintiff claims under a Spanish grant by Cayetano Perez, of date December 12, 1809, act of Congress confirming the same, July 2d, 1836, and a patent from the United States in pursuance thereof, dated March 15th, 1837.
 'Defendant insists that plaintiff's title is not good, because the Spanish grant of itself is incomplete and invalid, and although it was confirmed by act of Congress in 1836, yet, the premises sued for being the shore of a navigable river, lying below high-water mark at the time the State of Alabama was admitted into the Union, Congress, at the time of the act of confirmation, had no control over the subject, and was powerless to add any thing or impart any vitality to the Spanish grant.
 'The plaintiff replies and says, that, by the treaty of 1819 with Spain, Spanish grants of the character of that under which the plaintiff claims were recognized by the United States, who assumed the obligation that said grants should be satisfied and confirmed. This obligation the plaintiff contends is to be considered as a contract with the persons holding these grants; and no legislation of the United States, without the consent of such persons, can impair this obligation, or excuse the performance of the duties it clearly imposes.
 'From this statement of the case, the first question that naturally presents itself is, What was the character of the interest the United States had in the premises in 1836, or had they any interest at that time in the soil?
 'In March, 1819, Congress passed an act to enable the people of Alabama Territory to form a constitution and State government, and for the admission of such State into the Union on an equal footing with the original States. That act declares that all navigable waters within the said State shall for ever remain public highways, free to the citizens of said State and the United States. What is the footing on which the original States stand in regard to the shores of their navigable rivers, and the soil covered by them? That footing is certainly the perfect and absolute control of the shores of those rivers in the respective States, except so far as the United States government may find it necessary to use them in the legitimate exercise of its constitutional rights. For the purpose of enabling itself to do this, so far as Alabama is concerned, it has not thought proper to assert any rights of ownership in the shore, but has rather relinquished the idea of such ownership in itself, and recognized it in the State, by stipulating for a free use of said shores by the citizens of the United States.
 'What has been said is based upon the assumption that, by the treaty with Spain, the United States acquired the same property in the shores of navigable rivers that Spain had, and that they had, by the act of 1819, transferred the rights acquired under the treaty to the State of Alabama, reserving only the easement of navigation to the citizens of the United States. The question then arises, Could the United States, in contravention of the obligation they had incurred under the Spanish treaty, ratify and confirm these Spanish grants?
 'If Spain could have granted the shores of navigable rivers, and the same power that Spain had had been conferred upon the United States by the treaty of 1819, and in pursuance of that treaty, and the pledges therein given, the United States had confirmed this grant prior to the admission of Alabama into the Union, there can be no doubt that the plaintiff's title would have been valid; but this was not done.
 'Before it is done, the United States place themselves in a position where they cannot do it. Whether they ought to have placed themselves in that position, or what are the consequences of this act, so far as the Spanish government is concerned, or the inviolability of the treaty between the two nations, it is needless now to inquire. If wrong has been done, the law of nations indicates the remedy. We must look at things as they are, and so viewing, the court is impelled to the conclusion, that if, at the time of the admission of the State of Alabama into the Union, the land described in plaintiff's declaration was below ordinary high-water mark, there was no interest in the same in the United States in 1836, and that the act of confirmation, and the patent in pursuance thereof, could not aid plaintiff's title, and that the same is invalid and unsound.'
 To which charge the plaintiff excepts, and prays the court to sign, seal, and certify this bill of exceptions, which is done.
 Under these instructions, the jury found a verdict for the defendant, and, the case being carried to the Supreme Court of Alabama, that court affirmed the judgment of the Circuit Court.
 A writ of error then brought the case up to this court.
 It was argued by Mr. Phillips and Mr. Coxe, for the plaintiffs in error, and Mr. Campbell, for the defendant in error.
 It is not thought necessary to insert those parts of the arguments of counsel relative to the effect of the admission of Alabama into the Union upon the subsequent power of Congress to grant land between high and low water mark upon navigable rivers. The court, in its opinion, considers that point as settled in the case of Pollard v. Hagan, 3 Howard, 212. The counsel for the plaintiff in error, however, drew a distinction between that case and the present, as follows.
 The case as now presented, however, differs materially from the case of Pollard v. Hagan, in 3 Howard. The Spanish concession was not then before the court, and the acts and patent relied upon were all subsequent to the date of admission.
 The concession to Pollard, made while Spain was in the undisturbed possession of the territory, by every principle, either of national or municipal law, gave him a claim of title upon this government, which it was bound in good faith to perfect. It is true that, if the political departments refused to discharge their obligation, the courts of justice could not enforce it; but the want of this sanction in no wise impaired its obligatory force.
 
 
 1
 Having by the treaty with France, in 1803, acquired our title, and by the treaty with Spain, in 1819, termed on its face a treaty of cession, confirmed our possession to this territory, treaty stipulations and the law of nations arose to control the action of the government as strongly as if the duties were imposed by constitutional provision.
 
 
 2
 The annexation of this acquisition to the Mississippi Territory by the act of 1812 did not obstruct the exercise of those high duties, nor did the authority given by Congress that the State of Alabama might be carved out of it produce this consequence. The people of that State would have spurned an advantage founded upon a violation of national faith.
 
 
 3
 That Pollard's title was the subject of a confirmation by Congress is expressly ruled, when this case was first presented, in 14 Peters, the court there citing the decision of Judge Marshall in De la Croix v. Chamberlain, 'that the United States had never, as far as we can discover, distinguished between the concessions of land made by the Spanish authorities within the disputed territory, while Spain was in actual possession, from concessions of a similar character made by Spain within the acknowledged limits.' The court, therefore, concluded that Pollard's claim was within the exception of the act of 1824, reserving all cases where the Spanish government had made a 'new grant' during the time at which they had the 'power' to grant the same (p. 364).
 
 
 4
 All the circumstances constituting the history of the times justify the declaration that, in the admission of the State, neither of the contracting parties understood that the political obligations resting upon this government, as the successor of Spain, to perfect the titles of individuals acquired in good faith under Spanish dominion, were at all impaired; the more especially as it is not pretended that their fulfilment would in any manner work an injury to any public or private interest.
 
 
 5
 That the proprietorship of the soil between high and low tide belongs to the public, and may be acquired by individuals either by grant or prescription, is a doctrine of the common law, taught by Sir Matthew Hale in his treatise De Jure Maris (1 Hargrave's Law Tracts, p. 37), citing Bracton, who, in turn, quotes the Roman civil law from Justinian's Digest. Constable's case, 3 Co. 105, 107. There being but this distinction between the common and civil law, that the former confines this right to the 'sea-shore, arms of the sea, bays, and rivers where the tide ebbs and flows,' while the latter extends the right to include all 'navigable rivers.' Ingraham v. Wilkinson, 4 Pick. 273.
 
 
 6
 The government, therefore, had the right to grant to Pollard the fee of the soil, subject only to the restraints imposed by the public interest and convenience. Blundel v. Collvel, 5 Barn. & Ald. 267; Browne v. Kennedy, 5 Har. & Johns. 195; Hagan v. Campbell, 8 Port. 9; Mayor v. Eslava, 9 Port. 596.
 
 
 7
 The counsel for the defendant in error noticed this subject in his third and sixth points.
 
 
 8
 3. The decisions of this court reported in 3 Howard, 212, and 16 Peters, 367, are directly against the right of the United States to grant the shore after the admission of Alabama into the Union. Such being the law upon this question, the only inquiry is, whether the production of an incomplete Spanish title (a mere permit to occupy) can change the result. This court has repeatedly decided that such a paper can give the party no standing in the court, no matter when it was executed. 12 Wheaton, 599; 4 Howard, 449.
 
 
 9
 This court has also decided, that a complete grant bearing date at the time this does (1809) can give the party no right to be heard in the courts of the United States. Foster v. Neilson, 2 Peters, 253; 12 Peters, 511.
 
 
 10
 The party cannot, then, rest upon his Spanish title.
 
 
 11
 6. The opinion of the Supreme Court, reported in 3 Howard, 212, was very deliberately given. A motion for a rehearing was refused. The opinion comprehends within its principle property to a very large amount, and possessions and contracts have been made with respect to it.
 
 
 12
 In the State of Alabama, the Supreme Court has repeatedly acted in accordance with it, and has regarded it as the settled law of the land. An opinion so given, entering so far into the law of property of the country, cannot be questioned without producing great confusion. 8 Ala. 909, 930; 7 Ala. 883.
 
 
 13
 Mr. Chief Justice TANEY delivered the opinion of the court.
 
 
 14
 This is an action of ejectment brought by the plaintiff in error to recover a lot of ground in the town of Mobile, in the State of Alabama. The plaintiff claimed title under an inchoate Spanish grant, dated, December 12, 1809, and an act of Congress confirming this title, passed July 2, 1836, and a patent from the United States, dated March 15, 1837, which issued in pursuance of the act of Congress.
 
 
 15
 The validity of this title was disputed by the defendant, upon the ground that the premises were a part of the shore of a navigable tide-water river, lying below high-water mark, when the State of Alabama was admitted into the Union in 1819; and that therefore, at the time of the passage of the act of Congress, the sovereignty and dominion over the place in question were in the State, and not in the United States. And the court instructed the jury, that, if the land described in the plaintiff's declaration was below ordinary high-water mark at the time Alabama was admitted into the Union, the confirming act of Congress and the patent conveyed no title to the patentee.
 
 
 16
 The question decided in the State court cannot be regarded as an open one. The same question upon the same act of Congress and patent was brought before this court in the case of Pollard v. Hagan, at January term, 1845, reported in 3 Howard, 212. That case was fully and deliberately considered, as will appear by the report, and the court then decided that the act of Congress and patent conveyed no title. The decision of the Supreme Court of Alabama, from which this case has been brought by writ of error, conforms to the opinion of this court in the case of Pollard v. Hagan. And it must be a very strong case indeed, and one where mistake and error had been evidently committed, to justify this court, after the lapse of five years, in reversing its own decision; thereby destroying rights of property which may have been purchased and paid for in the mean time, upon the faith and confidence reposed in the judgment of this court. But, upon a review of the case, we see no reason for doubting its correctness, and are entirely satisfied with the judgment then pronounced.
 
 
 17
 It has been supposed, in the argument for the plaintiff, that the proceedings in Congress upon the report of the commissioners in relation to the title claimed under the Spanish authorities, which have now been referred to, distinguish this case from that of Pollard v. Hagan. But this Spanish title was acquired in 1809, and it has been repeatedly decided that a Spanish grant in this territory, whether inchoate or complete, made after the treaty of St. Ildefonso, in 1800, did not convey any right in the soil to the grantee. And this subject was again considered and decided, after careful research and examination, at the present term, in the case of Reynes v. United States, and the former decisions reaffirmed. Undoubtedly, Congress might have granted this land to the patentee, or confirmed his Spanish grant, before Alabama became a State. But this was not done. And the existence of this imperfect and inoperative Spanish grant could not enlarge the power of the United States over the place in question after Alabama became a State, nor authorize the general government to grant or confirm a title to land when the sovereignty and dominion over it had become vested in the State.
 
 
 18
 The judgment of the Supreme Court of Alabama is therefore affirmed.
 
 Order.
 
 19
 This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Alabama, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, affirmed, with costs.