W. S. Bennett, Appellant, v. The National Starch Manufacturing Company.

|103|207|
|112|717|
|103|207|
|115|694|
|103|207|
|117|99|
|103|207|
|125|418|

**Accretions Defined.** In a suit commenced in 1893 and tried in 1895, between the respective owners of adjoining lots, numbered ten to fifteen, bounded on the south by the Des Moines river at a point where it flows east, the question was whether certain ground south of the original river bank, forming the boundary of lot ten, was accretion. When the section of which such lots are a part was surveyed by the United States, the river near such lots was separated by an island, into two parts, and the place in controversy was covered by the north one of the two channels. Subsequently a large part of the island was cut away, and the north channel partially filled, discharges from sewers above contributing to such result; and for several years prior to 1895 water had not covered the tract in question, except in times of high water. In October, 1895, a rise of nine feet would have been required to cause water coming down the river to flow over it, though a considerable portion would have been covered by back water, from a smaller rise. The deposits in the old north channel are of sand and refuse from sewers. The soil thus formed does not produce grass, and is not suitable for agricultural purposes; cottonwood trees, willows, weeds, and sand burrs growing on it. The two banks are distinct, and in most places several feet higher than the place in question; and the river would overflow all of that before it could overflow either bank. For several years before the trial such tract had not been overflowed, and it had on it cottonwood trees and willows of three or four years' growth; but the river had been unusually low for several years. *Held*, that the ground in question was not an accretion.

**Boundaries: WATERS.** The title to land derived under conveyances made while the Des Moines river was regarded as navigable, describing the premises conveyed as bounded by the bank of such river, only extends to the edge of the bank, notwithstanding that the river is not now regarded as navigable.

**SAME.** The owners of land bordered by a navigable stream own only to ordinary high water mark,—that is, to the edge of the bank,—and the whole bed of the river belongs to the public.

**SAME.** The line which separates the bed of a navigable stream from the land owned by the riparian proprietor is not the line reached by unusual floods, but that which is shown by the character and condition of the soil and vegetation to be the limit which high

water ordinarily reaches.   Citing *Carpenter v. Board,* 56 Minn., 513 (58 N. W. Rep. 295).

ACCRETIONS.   Accretions between the meander line and a navigable river belong to the riparian proprietor.

**Injunction:** WATER.   The discharge of sewage from a manufactory into a running stream will not be enjoined on the complaint of a lower riparian owner that it emits disagreeable odors, where the causes of offense for which the defendant was responsible were almost wholly removed before the action was commenced, and the use which it is making of the river is a proper one, in view of the business which it carries on and the conditions which exist in the locality.

*Appeal from Polk District Court.*--HON. T. F. STEVEN-SON, Judge.

THURSDAY, OCTOBER, 14, 1897.

ACTION in equity to enjoin the maintenance of a sewer on land claimed by the plaintiff, to abate an alleged nuisance, and for other relief.   There was a hearing on the merits, and a judgment for the defendant.   The plaintiff appeals.—*Affirmed.*

*Day & Corry* for appellant.

*C. C. & C. L. Nourse* for appellee.

ROBINSON, J. — The  plaintiff is, and has been for many years, the owner of a tract of land now known as "lot numbered 10, of official plat of section 12, in township 78 north, of range 24 west of the 5th P. M." In the year 1870 he sunk on the lot an artesian well, from which he obtained and sold mineral water, and in the year 1874 or 1875 he built a sanitarium for use in connection with the well, to which for a time many people resorted.   A family residence was also erected a few rods from the site of the sanitarium.   For some time prior to the year 1890 the Gilbert Starch Company owned and operated a starch factory, which was located

on lot numbered 15 of the official plat of section 12, west of and adjoining the lot owned by the plaintiff. Both lots were bounded on the south by the Des Moines river, which there flows along an irregular course, the general direction of which is from west to east. For the purpose of discharging the sewage from its factory into the Des Moines river, the Gilbert Starch Company had maintained an open board sewer which extended from the factory to the river bank. That was well defined and constituted the southern boundary of the two lots we have described, when section 12 was surveyed by the general government; but about the year 1889 the channel of the river in that vicinity seems to have been changed to the southward, and thereafter, and until the time of the trial in the district court, the water in the river, when at an ordinary stage or lower, did not reach the original bank. In the year 1890 the Gilbert Starch Works were transferred to the defendant. A few days later the factory was burned, but was rebuilt in the latter part of the year 1892, and the new factory was put in operation in April, 1893. In December, 1892, the defendant constructed a new sewer by laying a fifteen-inch tile pipe on the bottom of the old one until the end of the latter was reached at the old river bank, and from that point, which was but a few feet west of the west boundary line of the lot of the plaintiff, constructed an extension in a southeasterly direction to the bank of the river as it then existed. That extension of the sewer is now a little more than seven hundred feet in length, and its outlet is four hundred and twenty feet south of the original north bank of the river, and six hundred feet southwest of the sanitarium of the plaintiff. The defendant has used that sewer since April, 1893, and during that time has discharged through it the sewage from its factory. This action was commenced in September of the year 1893, and

the trial of the cause was commenced in the district court two years later, and finally concluded the last of October, 1895. The plaintiff claims as follows: (1) That the change in the river channel is permanent, and that by accretion the south boundary of lot 10 has been extended south to the bank of the river as it now flows; that all of the extension of the defendant's sewer which is east of the west boundary line of lot 10 produced to the new bank is on the land of the plaintiff without his consent, and that its maintenance and use on his land constitute a trespass. (2) That the sewage which flows through the sewer is deposited in such manner and in such quantities as to contaminate the water of the river, and impregnate the atmosphere with a stench so great and offensive as to prevent the comfortable enjoyment of the premises of the plaintiff by himself or others, and endanger their health and lives, thereby constituting a nuisance. The district court found that neither of these claims was sustained by the evidence, and rendered judgment in favor of the defendant for costs.

I.   We are first required to determine whether the premises in controversy are a part of the river bed, or whether they have become a part of lot 10 by the process of accretion. It is the settled rule in this state that the owners of land bordered by a navigable stream own "only to ordinary high-water mark, —that is, to the edge of the bank,"—and that the whole bed of the river belongs to the public. *Musser v. Hershey*, 42 Iowa, 361. The conveyances through which the plaintiff derived title to his lot described the premises conveyed as bounded on the south by the north bank of the Des Moines river, and, although the river is not now regarded as navigable, the rule which limits the ownership of the plaintiff to land bounded by the ordinary high-water mark applies. *Serrin v. Grefe*, 67 Iowa, 198; *Railway*

*Co. v. Porter,* 72 Iowa, 429. The appellant does not dispute these propositions, but contends that the premises in question are now above high-water mark, and therefore constitute an accretion to his original lot. It is true that accretions between the meander line and the river belong to the riparian proprietor. *Coulthard v. Stevens,* 84 Iowa, 242; *Cook v. City of Burlington,* 30 Iowa, 99; *Kraut v. Crawford,* 18 Iowa, 549. The line which separates what belongs to the river bed from that which is owned by the riparian proprietor is not the line reached by unusual floods, but that which is shown by the character and condition of the soil and vegetation to be the limit which high water ordinarily reaches. Soil which is submerged so long or so frequently, in ordinary seasons, that vegetation will not grow upon it, may be regarded as part of the bed of the river which overflows it. *Houghton v. Railroad Co.,* 47 Iowa, 370. In *Carpenter v. Board,* 56 Iowa, 513 (58 N. W. Rep. 295), it is said: "High-water mark means what its language imports,—a water mark. It is co-ordinate with the limit of the bed of the water; and that only is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation, and destroy its value for agricultural purposes." See, also, *Plumb v. McGannon,* 32 U. C. Q. B. 14; Gould, Waters, section 76. When section 12 was surveyed by the general government, the river near what are now known as lots 10 and 15 was separated by an island into two parts, and the place in controversy was covered by the north one of the two channels thus formed. Since that time a large part of the island has been cut away by the river, and the north channel has been partially filled; discharges from the sewers of numerous factories located near the river and above the land of the plaintiff doubtless having contributed to that result. The main channel of the river is now

further south than it was fifteen years ago, and for several years water has not covered the tract in question excepting in times of high water. In October, 1895, a rise of nine feet would have been required before water coming down the river would have flowed over it, although a considerable portion would have been covered by back water from a smaller rise. The deposits which have been made in the old north channel are of sand and the refuse from sewers. The soil thus constituted is not suitable for agricultural purposes, nor does it produce grass. Cottonwood trees, willows, weeds, and sand burs comprise what grows upon it. The two banks are distinct, and in most places rise several feet higher than does the tract in question. The river would overflow all of that before it could overflow either bank. For several years the tract has not been overflowed, and cottonwood trees and willows of three or four years' growth were found upon it at the time of the trial, but it appears that the river had been unusually low for several years. A witness who had lived near the river for forty years stated that it was lower during the preceding three years than it had been during the remainder of the time he had known it. We are satisfied that a preponderance of the evidence shows that the tract in question has the characteristics of a river bed uncovered for a few years by reason of unusually low water, and a change in the channel of the stream, which may be only temporary; that it is subject to overflow in ordinary times of high water, and is worthless for agricultural purposes. We conclude, therefore, that it is not a part of the lot owned by the plaintiff, and that the defendant is not a trespasser in placing and using its sewer on it.

II.    The evidence in regard to the kind, quantity, and effect of the discharges from the sewer is some-

what conflicting. There is no doubt that at times it has emitted disagreeable odors. In the spring of the year 1893 high water formed a sand bar near to and above the mouth of the defendant's sewer, which formed a bay into which the sewer discharged, and for a time the sewage was troublesome; but in July the sewer was extended through the bay and the sand bar to the current of the river, and that difficulty was remedied. At another time a break in the sewer occurred where it crossed the bay, and there was a leakage of sewage, which was offensive; but that also was remedied. Since February, 1894, very little of an offensive nature passed through the sewer, and the defendant has used due care to keep the sewer in good order, and to prevent any considerable discharge from it of offensive matter. The causes of offense for which the defendant was responsible were almost wholly removed before this action was commenced; and the use which the defendant is now making of the river appears to be a proper one in view of the business it carries on and the conditions which exist in that locality. Some witnesses state that the discharge from the defendant's sewer caused disagreeable odors, while other witnesses, whose opportunities for knowing the fact have been equally as good, state that the odors emitted were not of a serious character. Some of the testimony relates to the discharges from the old Gilbert Starch Company sewer, for which the defendant is not responsible. The sanitarium of the plaintiff is vacant, but he is not certain that he had rented it more than once, and then for a single winter, during the ten years preceding the trial. The evidence is not sufficient to sustain the claim that the sewer as it is operated by the defendant is a nuisance, nor to show that the plaintiff has sustained injury from any unauthorized use of it. The judgment of the district court is therefore AFFIRMED.