495 P.2d 1312

The STATE of Arizona et al., Appellants,

v.

BONELLI CATTLE COMPANY, a California corporation, Appellee.

No. 10030–PR.

Supreme Court of Arizona,
In Banc.
April 13, 1972.

Gary K. Nelson, Atty. Gen., by Dale R. Shumway, Special Asst. Atty. Gen., Phoenix, for appellants.

Elmer C. Coker, Phoenix, for appellee.

Snell & Wilmer, by Maynard P. Goudy, Fennemore, Craig, von Ammon & Udall, by John J. O'Connor, III, Streich, Lang, Weeks, Cardon & French, by Dan M. Durrant, Evans, Kitchel & Jenckes, P. C., by Burton M. Apker, Phoenix, Bilby, Thompson, Shoenhair & Warnock, P. C., by W. E. Dolph, Jr., Robertson, Molloy, Fickett & Jones, P. C., by Russell E. Jones, Tucson, Westover, Keddie & Choules, by G. Thomas Choules, Yuma, amici curiae.

STRUCKMEYER, Justice.

Appellee Bonelli and others who have appeared as amici curiae have principally advanced economic reasons for rehearing our decision in State v. Bonelli Cattle Company, 107 Ariz. 465, 489 P.2d 699 (1971). Such are more properly matters of legislative consideration than the concern of a court whose responsibility is to adhere to the law as it finds it so that rights will not depend on the personal idiosyncracies of its members or hang in suspense when economic considerations change.

We are concerned, however, with one possible area of misunderstanding. In our decision, we used the words "high water line" and "high water mark." In particular, we directed the court below to quiet title in Arizona from the Nevada line to the high water mark. The parties question the meaning of our use of the words "high water mark."

The title to all lands within the beds of navigable waters including all reclaimed lands which formerly were beneath navigable waters up to the ordinary high water mark was quit claimed in 1953 to the states by the Submerged Lands Act of Congress, 67 Stat. 29, 43 U.S.C.A. § 1301 et seq. The Act specifically included lands "heretofore or hereafter modified by accretion, erosion, and reliction." Beyond argument, title to and ownership of the lands beneath the Colorado River is in the State of Arizona from the Nevada boundary up to the ordinary high water mark in the natural channel as it existed prior to the taming of the river in 1938 by the completion of the Hoover Dam and the subsequent lowering of the channel by dredging.

Congress, of course, could not constitutionally diminish the property rights of the states to the beds of navigable rivers as settled by over 100 years of decisions of the Supreme Court of the United States commencing with Pollard v. Hagan, 44 U. S. 212, 3 How. 212, 11 L.Ed. 565, in 1845. Most certainly, the United States government could not claim additional rights in the bed of a navigable river by the construction of dams and artificial channels. Nor do we find such an intent.

In considering Congress' language, we take it that the word "ordinary" is used in its customary sense, meaning "not uncommon or exceptional," Webster's Third International Dictionary. This is con-

firmed by an examination of the opinions in Pollard v. Hagan, supra, and Goodtitle v. Kibbe, 50 U.S. 471, 9 How. 471, 13 L. Ed. 220.

In Pollard v. Hagan, the trial court in Alabama charged the jury that if it believed the premises sued for were below the *"usual* high water mark" at the time Alabama was admitted to the Union, then the plaintiffs acquired no title through patents of the United States government *"whether the waters had receded by the labor of man only, or by alluvion."* (Emphasis supplied.) The Supreme Court of Alabama affirmed the judgment entered on the jury's verdict and its judgment, in turn, was affirmed by the Supreme Court of the United States. In Goodtitle v. Kibbe, supra, the Supreme Court of the United States reconsidered the issues decided in Pollard v. Hagan and reaffirmed its previous decision. There, the trial court instructed the jury that if plaintiff's land was below *"ordinary* high water mark" at the time Alabama was admitted to the Union, the confirming Act of Congress and the patent from the United States government conveyed no title. (Emphasis supplied.)

It is in the sense of the usual and ordinary that the words "high water line" and "high water mark" where used in our decision are to be understood.

It should be made clear that Arizona's title as against private persons is in no way controlled by the opinion in United States v. Claridge, 279 F.Supp. 87, aff'd 9th Cir., 416 F.2d 933. The patent through which Bonelli Cattle Company claims title was issued by the United States November 5, 1910. The subsequent artificial control of the river could not deprive Arizona of property rights in the bed which were constitutionally vested prior to the completion of the Hoover Dam in 1938 and the later rechannelization by dredging. The condition of the Colorado River at or immediately prior to its control by artificial works is the appropriate time for determining the rights of the parties, although, of course,

evidence of the river's condition thereafter may be illuminating.

Since Arizona's title to the bed of the Colorado River is the mark to which the water formerly rose at the time of or in the seasons of ordinary high water, and since we deem it desirable that any possible controversy be avoided, we approve for the purpose of determining the bed and banks this particular language of Justice Curtis concurring in Howard v. Ingersoll, 54 U.S. 381, 13 How. 381, 427, 14 L.Ed. 189:

"[T]he banks of a river are those elevations of land which confine the waters when they rise out of the bed; and the bed is that soil so usually covered by water as to be distinguishable from the banks, by the character of the soil, or vegetation, or both, produced by the common presence and action of flowing water."

Further, we approve the definition of "high water mark" as applied to a natural channel by the Supreme Court of Iowa in State v. Sorenson, 222 Iowa 1248, 271 N. W. 234:

"An accepted definition of 'high-water mark' is set out in the case of City of Cedar Rapids v. Marshall, 199 Iowa, 1262, loc. cit. 1264, 203 N.W. 932, 933, where this court said: 'The term "ordinary high-water mark" has been frequently defined by this and many other courts. It is not the line reached by unusual floods, but it is the line to which high water ordinarily reaches. [Citing case.]' ' "High-water mark" means what its language imports—a water mark. It is co-ordinate with the limit of the bed of the water; and that only is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation, and destroy its value for agricultural purposes.' * * * Bennett v. National Starch Mfg. Co., 103 Iowa, 207, 72 N.W. 507; * * * Houghton v. C., D. & M. R. Co., 47 Iowa, 370.

The high-water mark, therefore, may be defined as to the line to which high

water ordinarily reaches, and is not the line· reached by the water in unusual floods. It is that line below which the soil is unfit for vegetation or agricultural purposes."

Our decision directing the Superior Court of Mohave County to enter judgment quieting title in the State of Arizona from the Nevada boundary to the high-water mark as supplemented by this decision is approved.

HAYS, C. J., ROBERT O. ROYLSTON, Judge, Superior Court, Pima County, and WARREN L. McCARTHY, Judge, Superior Court, Maricopa County, concur.

NOTE: Justice JAMES DUKE CAMERON and Retired Justice JESSE A. UDALL having announced their disqualification to sit in the determination of this matter, the Honorable ROBERT O. ROYLSTON and Honorable WARREN L. McCARTHY were called to sit in their stead.

LOCKWOOD, Justice (dissenting):

I dissent from the holding in the foregoing supplemental opinion which reaffirms the original decision ordering the title to the property involved quieted in the State of Arizona.

The reasons for my dissent are fully set forth, as attached to the original opinion. They are basically two-fold:

· (1) The majority of the court justifies its decision by application of common law principles of rights of riparian land owners. In my opinion the common law is inapplicable because the principles adopted are not, pursuant to the statutory provisions of A.R.S. § 1–201, "consistent with and adapted to the natural and physical conditions of this state and the necessities of the people thereof." (2) The decision violates the provisions of Article 2, § 17, Arizona Constitution, A.R.S., in that the result, i. e., permitting the state to acquire without compensation large quantities of

property from private owners, constitutes a taking of the land for·public use without just compensation having been made therefor.