NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURG,
PENNSYLVANIA

v.

UNITED STATES of America.

No. 77–3119–NA–CV.

United States District Court,
M. D. Tennessee,
Nashville Division.

June 30, 1977.

John K. Maddin, Jr., H. Barton Williams, Gracey, Maddin, Cowan & Bird, Nashville, Tenn., for plaintiff.

William H. Farmer, Asst. U. S. Atty, Nashville, Tenn., for defendant.

## MEMORANDUM

MORTON, District Judge.

This action is before the court on the motion to dismiss filed by the defendant United States of America ("the Government"). The suit was filed by the plaintiff insurance company as subrogee to the rights of a steel company which suffered water damage to a quantity of its stock stored in a warehouse. The damage resulted from flooding by the Cumberland River. Plaintiff maintains that the Government, through the Army Corps of Engineers, negligently failed to exercise proper flood control procedures in connection with its maintenance of certain dams on the Cumberland. As a result, plaintiff contends, rapidly rising waters inundated a portion of its insured's plant, located on or near the banks of the river.

Plaintiff seeks to bring this suit pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, and in particular, under § 742, which provides for a limited waiver of sovereign immunity and sets out the procedure for suits in admiralty against the United States. Although plaintiff has failed to plead a jurisdictional basis, jurisdiction presumably is predicated on 28 U.S.C. § 1333.

Section 742 provides in pertinent part as follows:

"In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States . . .."

Prior to 1960, § 742 provided only for suits involving "a vessel" or "cargo" owned, operated, or possessed by the United States. The section was amended in that year, however, to include, *inter alia,* the phrase "or if a private person or property were involved". The intended meaning of that phrase has been the subject of juridical disagreement,[1] but the legislative history[2] as well as the decided weight of judicial authority[3] strongly suggests that the addition of the phrase was intended by Congress as an extension of the statute's waiver of sovereign immunity to *all* suits sounding in admiralty, not just those involving vessels or cargo. Thus in the instant case, it would appear that the absence of a vessel or a ship's cargo would not *ipso facto* defeat application of section 742. What must still be determined, however, is whether the injury suffered in this case is one which does in fact sound in admiralty.

The scope of admiralty jurisdiction in the area of torts has traditionally been limited to wrongs committed on the high seas or navigable waters of the United States. *Victory Carriers, Inc. v. Law,* 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). Upon this basic jurisdictional principle, often referred to as the strict locality rule, there have been engrafted four modifying doctrines, two of which have generally operated to expand admiralty jurisdiction while the other two have generally operated to constrict it.

The first of these doctrines was enunciated by the Supreme Court in *The Blackheath,* 195 U.S. 361, 25 S.Ct. 46, 49 L.Ed. 236 (1904), a case involving a collision between a vessel and a beacon resulting in damage to the latter. The beacon was completely surrounded by water, but was attached to the sea floor. Thus, technically, it was a part of the realty under common law and hence outside of admiralty jurisdiction. The court, however, observing the uniquely maritime purpose of the beacon, saw fit to extend admiralty jurisdiction to such a situation. Thus was born what has come to be known as the "damage to fixed navigational aid structures" exception to the strict locality rule. Under this doctrine, a tort involving a structure which is (1) completely surrounded by navigable waters, and (2) an aid to navigation, falls within admiralty jurisdiction.

The other extension of the strict locality rule was legislatively created in 1948 with

---

1. Compare *J. W. Peterson Coal & Oil Co. v. United States,* 323 F.Supp. 1198 (N.D.Ill.1970) *with Kelly v. United States,* 531 F.2d 1144 (2d Cir. 1976).

2. *See, e. g.,* Senate Report No. 1894, 86th Cong., 2d Sess., 1960 U.S. Code Cong. & Admin. News, p. 3583 et seq. *See also,* Senate Report No. 92–1079, 92d Cong., 2d Sess., 1972 U.S. Code Cong. & Admin. News, p. 3129 et seq. While the latter report was issued some twelve years after the fact, and thus, in the words of the court in *Richmond Marine Panama, S.A. v. United States,* 350 F.Supp. 1210, 1219–1220 (S.D.N.Y.1972), "is not binding on the courts" since it merely constituted "subsequent Congressional explanation of the meaning of a statute . . .," it is nonetheless a very good indication of what Congress had in mind during the course of its prior enactment. *See Gercey v. United States,* 409 F.Supp. 946 (D.R.I.1976), *aff'd,* 540 F.2d 536 (1st Cir. 1976).

3. *See, e. g., Kelly v. United States, supra; DeBardeleben Marine Corp. v. United States,* 451 F.2d 140 (5th Cir. 1971); *Szyka v. United States Secy' of Defense,* 525 F.2d 62 (2d Cir. 1975); *T. J. Falgout Boats, Inc. v. United States Sec'y of Defense,* 525 F.2d 62 (2d Cir. 508 F.2d 855 (9th Cir. 1974), *cert. denied,* 421 U.S. 1000, 95 S.Ct. 2398, 44 L.Ed.2d 667 (1975); *Roberts v. United States,* 498 F.2d 520 (9th Cir. 1974), *cert. denied,* 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974); *Richmond Marine Panama, S.A. v. United States, supra; Tankrederiet Gefion A/S v. United States,* 241 F.Supp. 83 (E.D.Mich.1964); *Gercey v. United States, supra; Ira S. Bushey & Sons, Inc. v. United States,* 398 F.2d 167 (2d Cir. 1968); *United Continental Tuna Corp. v. United States,* 499 F.2d 774 (9th Cir. 1974).

the enactment of the Admiralty Jurisdiction Extension Act, 46 U.S.C. § 740. What that act in effect provides is that injuries caused by a vessel upon navigable waters, whether the injury is consummated on the water or upon land, are cognizable in admiralty. This law constituted a Congressional response to the Supreme Court's holding in an early case, *The Plymouth*, 70 U.S. (3 Wall) 20, 18 L.Ed. 125 (1866), where the Court refused to extend admiralty jurisdiction to a case in which a shipboard fire spread to a dock, doing extensive damage.

■ The Court's refusal in *The Plymouth* to extend admiralty jurisdiction to dockside injuries illustrates one of the restrictive aspects of the strict locality rule which, absent applicability of the Extension Act, still circumscribes admiralty jurisdiction. Commonly known as the "extension of land" doctrine, this rule denies admiralty jurisdiction to injuries occurring on bridges, piers, docks, jetties, ramps, railways and the like, which, though they may extend over or actually project into and beneath navigable waters, are nonetheless considered so integrated into the mainland that they are treated as a part of it. *See, e. g., T. Smith & Son, Inc. v. Taylor*, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928); *Swanson v. Marra Bros., Inc.*, 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946).

■ The other limitation on the locality rule, which has gained increasing popularity in recent years, is what may be termed the "maritime connection" doctrine. This rule, also referred to as the "locality plus" test, requires that in addition to a maritime locality, the tort at issue must involve or be connected with some maritime activity. In other words, the injury must arise out of some activity traditionally associated with navigation, commerce on the water, or other conduct peculiarly related to maritime affairs, before admiralty jurisdiction can be assumed. This doctrine is not a new one; it was enunciated as early as 1893 by the Ninth Circuit in *Campbell v. H. Hackfeld and Co.*, 125 F. 696 (9th Cir. 1893). It enjoyed a degree of favor in other circuits in the years that followed, *see, e. g., Chap-*

*man v. City of Grosse Pointe Farms*, 385 F.2d 962 (6th Cir. 1967), though it was not universally accepted, *see, e. g., Weinstein v. Eastern Air Lines, Inc.*, 316 F.2d 758 (3d Cir. 1963). In 1972, however, the Supreme Court had occasion to consider the so-called "locality-plus" test and adopted its basic requirement that something more than mere maritime locale was necessary in order to give federal courts admiralty jurisdiction of an airline accident occurring on navigable waters. *Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1973). It thus seems clear, at least in this circuit, in light of the *Chapman* and *Executive Jet* decisions, that the "maritime connection" doctrine prevails.

In viewing the facts of the instant case, it is immediately apparent that the two "jurisdiction-expanding" doctrines are inapplicable. Since the property damaged in this case was not in any sense of the term a "navigational aid," the first doctrine discussed above has no pertinence. Similarly, inasmuch as no "vessel" was involved in the complained-of accident, the Extension Act is inapplicable.

■ The two "jurisdiction-restricting" doctrines, however, require closer examination. The "extension-of-land" doctrine, as stated previously, is of primary importance in cases where the tort occurs on a structure, such as a bridge, ramp, or pier, which may be so erected as to extend over or into navigable waters. In these cases the courts have traditionally withheld admiralty jurisdiction by reference to the strict locality rule, reasoning that the structure, even though surrounded by—and in cases, partially submerged in—water, has a character more terrene in nature than aquatic. References are frequently made to the "purpose and use" of such structures, *see, e. g., Hastings v. Mann*, 340 F.2d 910, 912 (4th Cir. 1965), *cert. denied*, 380 U.S. 963, 85 S.Ct. 1106, 14 L.Ed.2d 153, with the suggestion that they are "connected with the shore and immediately concerned with commerce upon land." *Cleveland Terminal & Valley R.R. v. Cleveland S.S. Co.*, 208 U.S.

316, 321, 28 S.Ct. 414, 416, 52 L.Ed. 508 (1908). While the situs of the alleged tort in the instant case—a steel warehouse on or near the shore of a navigable stream—does not fit neatly into the mold of structures usually associated with the extension-of-land doctrine, the principles underlying that doctrine are particularly applicable to the situation in this case. The warehouse in question was built upon the land, perhaps (as in the case of a dock or pier) purposely near the water for facilitating shipment of portions of the steel stored within it. (Indeed, plaintiff suggests just such a possibility on page 2 of its memorandum in opposition to defendant's motion to dismiss). The "purpose and use" of the warehouse were clearly terrestrial, the structure being "immediately concerned with commerce upon land." Indeed, its only arguable connection with the water existed, as suggested above, in a transportation context. Thus, while the instant case presents a "mountain coming to Mohammed" situation in which the river rose to partially inundate the warehouse, rather than the warehouse being purposely constructed over or within the river's natural flow, as in the typical extension-of-land case, the nature of the instant tort is not unlike that in cases where the extension-of-land doctrine is invoked to defeat admiralty jurisdiction.

Another feature which distinguishes this action from most extension-of-land cases is that it is the water itself which has been the principal agent of destruction. Even such a unique factual circumstance, however, is not without precedent in such cases. In *Cleveland Terminal & Valley R.R. v. Cleveland S.S. Co., supra,* the Court refused to recognize admiralty jurisdiction where some vessels broke loose from their moorings in the Cuyahoga River near Cleveland, Ohio, drifted downstream, collided with a bridge piling and dock, doing extensive damage, became wedged together between the piling and dock thereby partially damming the stream, causing the water to rise, increasing the velocity of the current underneath the keels of the vessels, which caused extensive damage to the bridge piling. The Court reasoned, as indicated previously, that the bridge and dock

> "pertained to the land. They were structures connected with the shore and immediately concerned commerce upon land. None of these structures were aids to navigation in the maritime sense, but extensions of the shore and aids to commerce on land as such." 208 U.S. at 321, 28 S.Ct. at 416.

So it is in the instant case. Indeed, the warehouse was not merely an "extension" of the shore, but an integral part of it, whose contiguity to navigable water was the freak result of a flood. Under ordinary conditions, the warehouse would never have been within the flow of the Cumberland, even at its high-water mark,[4] which is traditionally considered the outer limits of a navigable stream for purposes of recognizing admiralty jurisdiction. *See 2 Benedict on Admiralty,* § 5, pp. 1–41 (7th Rev. ed. 1975). In light of these considerations, then, this court is constrained to conclude that adherence to the spirit of the locality rule dictates rejection of admiralty jurisdiction in this case.

Even were this court to find, however, that the locality of the alleged wrong in this case was susceptible to admiralty's reach, application of the "maritime connection" doctrine would be fatal to jurisdiction under admiralty law.

As indicated previously, the doctrine requires that in addition to a maritime locale, the alleged tort must arise out of some activity which can legitimately be characterized as maritime in nature. Plaintiff contends that the maintenance of dams and water levels by the Corps of Engineers is an inherently maritime activity, since one of its main purposes is as an aid to navigation. Thus, plaintiff argues, inasmuch as the proximate result of said activity was the

---

4. The "high-water mark" of a navigable river is the line to which high water *ordinarily reaches* and is *not* the line reached by water in unusual floods. It is that line below which soil is unfit for vegetation or agricultural purposes. *State v. Bonelli Cattle Co.,* 108 Ariz. 258, 495 P.2d 1312 (1972); *Union Sand & Gravel Co. v. Northcott,* 102 W.Va. 519, 135 S.E. 589 (1926).

flood damage complained of, the maritime connection clearly exists in this case. Defendant rejects this analysis as improperly focusing upon the activities of the Corps rather than upon those of plaintiff's insured, arguing that the maintenance of a warehouse has nothing whatever to do with maritime activities. The cases addressing the issue suggest that plaintiff's analysis is probably the more accurate approach in applying the doctrine; that is, the range of activities undertaken by the Government, when such have caused injury to the plaintiff, are what must be examined in determining the existence *vel non* of a "maritime connection."

This principle is exemplified in the case of *Kelly v. United States,* 531 F.2d 1144 (2d Cir. 1976). In that case, the plaintiff maintained that the U. S. Coast Guard had negligently failed to rescue his decedent after the latter was involved in a sailboat accident on Lake Ontario. The plaintiff, seeking to bring the claim under the Federal Tort Claims Act, which excludes from its coverage actions sounding in admiralty, 28 U.S.C. § 2680(d), argued that the cause of action arose out of a pleasure-boating accident, an activity outside the scope of admiralty jurisdiction. In rejecting this argument, the court stated:

> "We believe, in any case, that this suit is not merely a 'pleasure boat accident case.' In fact, the case only tangentially involves boats at all. It primarily involves water rescue operations. The objects of the rescue could just as well have been fatigued swimmers as capsized boaters. The critical question, therefore, is not, as both parties have tended to frame it, whether pleasure boat cases fall within admiralty, but rather whether rescue cases involving the United States Coast Guard fit within this category. Viewing the case in this way, we conclude that rescue operations of the Coast Guard conducted on navigable waters do in fact bear a significant relationship to traditional maritime activities for purposes of admiralty jurisdiction." 531 F.2d at 1147

It thus appears clear that the proper focus in applying the maritime connection doctrine is the activity being carried on by the destructive party. However, this perspective does not obviate the necessity to apprise the activity in terms of its actual effects as well as its general nature. Thus, while control of the water level does generally involve considerations affecting navigation and commerce upon the water, the only actual impact of concern in this instance is the flooding of a shore-based warehouse. Viewed in this way, it becomes more difficult to perceive an actual maritime incident for which the unique principles and procedures of admiralty are pertinent. Had the rising water caused boats to break from their moorings and sustain damage, or inundated a barge and destroyed its cargo, this court would have little difficulty in finding admiralty jurisdiction. However, where the actual untoward consequence is of a kind which can readily be dealt with by resort to established common law tort principles, it makes no sense to dredge up (no pun intended) a whole body of law whose purpose and history is inextricably bound up in matters concerning maritime commerce. It should not be overlooked that the navigability of the Cumberland, which is a *sine qua non* of admiralty jurisdiction, had nothing whatever to do with the injuries sustained in this case. It is not inconceivable that a stopped up storm drain, during an abnormally heavy rainfall, could have resulted in essentially the same damage to the material in the warehouse. And in such a case, a suit against the municipality (assuming no immunity) alleging negligent failure to keep the sewers cleared of debris, could easily be disposed of within the contours of state tort law. The fact that the alleged culprit in the instant case was the Corps of Engineers and that the destructive force happened to be a navigable stream does not alter the availability, viability, and indeed, the preferability of state law for disposing of this case.

The reasoning above is not without precedent. In *Onley v. South Carolina Elec. & Gas Co.,* 488 F.2d 758 (4th Cir. 1973), the court determined that there was no admiralty jurisdiction where a diver was injured

when he struck a submerged boat ramp in a navigable lake, the water level of which was controlled by a power company in connection with the operation of a hydroelectric generating plant. In reaching its conclusion, the court made the following observations.

"We hold that appellee's control of the water level of a lake for the purpose of generating electricity, which results in a diving accident, does not bear a sufficiently significant relationship to traditional maritime activity to create federal admiralty jurisdiction. While the control of the water level of a navigable waterway may, in some cases, have an intimate relationship with maritime activities, there is no such maritime connection where a diving accident is the only consequence. The uniform body of rules and the expertise of admiralty are irrelevant to the issues in a diving accident. Conversely, the state tort law is most directly concerned with such accidents, and is quite capable of resolving the present controversy without any effect on the federal interest in maritime activities." 488 F.2d at 760

*See also* the thoughtful discussion of Judge Smith in *Adams v. Montana Power Co.*, 354 F.Supp. 1111 (D.Mont.1973), *aff'd*, 528 F.2d 437 (9th Cir. 1975), and the reasoning of the Sixth Circuit in *Chapman v. City of Grosse Pointe Farms, supra.*

For the foregoing reasons, this court will decline to exercise admiralty jurisdiction in this case. An appropriate order will be entered dismissing this cause. Plaintiff is, of course, free to pursue any remedies it may have through the proper administrative channels of the Federal Tort Claims Act.