NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA ex rel. ARIZONA STATE LAND DEPARTMENT,
*Plaintiffs/Appellants/Cross-Appellees*,

*v.*

SERIES 5, LLC, et al., *Defendants/Appellees/Cross-Appellants*.

No. 1 CA-CV 20-0203
FILED 3-2-2021

Appeal from the Superior Court in Maricopa County
No. CV2017-015782
The Honorable Rosa Mroz, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By David Jacobs, Paul A. Katz, Laurie A. Hachtel
*Counsel for Plaintiffs/Appellants/Cross-Appellees*

Snell & Wilmer LLP, Phoenix
By Kevin J. Parker, L. William Staudenmaier III
*Counsel for Defendants/Appellees/Cross-Appellants*

---

## MEMORANDUM DECISION

Presiding Judge Jennifer M. Perkins delivered the decision of the Court, in which Judge Randall M. Howe and Judge Maria Elena Cruz joined.

---

**P E R K I N S**, Judge:

**¶1**        The State challenges the superior court's ruling that the State did not obtain sovereign title to a disputed land parcel. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**¶2**        This appeal concerns a dispute over ownership of a land parcel ("Property") adjacent to the Colorado River in the Mohave Reach, an area south of Bullhead City. Series 5, LLC ("Series") is the record title holder to the Property. The State initiated a quiet title action in 2017. It claimed to have acquired sovereign title to the Property because the parcel previously sat "within the beds and banks of the Colorado River" following significant flooding between 1912 and 1915.

**¶3**        Both parties moved for summary judgment. Series argued in part the flooding constituted a "series of avulsions" under which "the riparian land boundaries do not move with the river (and thus ownership does not change)." It contended avulsion occurs "when a river's movement is sudden and rapid such that its banks visibly disintegrate." But the State argued avulsion requires a "lateral channel migration . . . when the River rapidly abandons its old channel, cuts a new channel, and leaves undisturbed land in between the old and new channels." Under that standard, it argued the 1912 to 1915 flooding constituted accretion and, if so, "the boundary of the State's property moved eastward with the OHWM [ordinary high-water mark] to encompass the Subject Property as of 1959."

**¶4**        The superior court accepted Series's definition of avulsion, quoting *State v. Bonelli Cattle Co.*, 107 Ariz. 465, 467 (1971) ("*Bonelli I*") (citations omitted) (emphasis added):

> It is common knowledge that rivers move sometimes so slowly as to be imperceptible during the lifetime of any single individual, and sometimes so rapidly by floods that the river's

> banks visibly disintegrate. **Where the change is sudden and rapid, the change is said to be by avulsion.** Erosion, on the other hand, is the eating away of the soil by the river's current, and is a gradual, imperceptible process. Where the river moves by erosion, the boundary moves with the stream, but where the river moves by avulsion, the boundary remains in the center of the old channel.

Applying this definition, the court found factual disputes as to "whether the Property came within the River's boundary, post-statehood, through avulsion or accretion" and denied both motions.

¶5        The case proceeded to a bench trial, at which the parties agreed "if the Subject Property came within the Colorado River's boundary through accretion, then the private property owner loses ownership of the Subject Property to the State." And "if the Subject Property came within the Colorado River's boundary through avulsion, then the private property owner does not lose ownership of the Subject Property to the State." Both sides presented expert testimony that the Colorado River submerged the Property after two major floods in 1912 and 1914. But the experts disagreed as to whether this flooding constituted avulsion or accretion.

¶6        Series's expert Rich Burtell testified the 1912 and 1914 floods constituted avulsion because the floods transformed the river "from a relatively narrow meandering system to a broad shallow system" and were "perceptible by somebody there at the time." In contrast, the State's expert Michael Kellogg testified Series could not show the flooding caused a "sudden change in flow alignment . . . leaving an identifiable upland area between the abandoned channel and the new channel," which he testified was necessary to show avulsion. He also contended Series could not establish: (1) the date of the first avulsive event after Arizona became a state on February 14, 1912; (2) the location of the left[1] OHWM before that avulsive event; and (3) the location of the left OHWM following that event. On that basis, he testified the court had to conclude that any rapid erosion caused by these floods constituted accretion.

¶7        Following trial, the court entered findings of fact and conclusions of law. Citing *Bonelli I* and *State v. Jacobs*, 93 Ariz. 336 (1963),

---

[1] Riverbanks (left vs. right) are identified from a downstream perspective; Arizona's bank of the Colorado River is the left bank.

the court defined accretion as "the gradual, imperceptible addition to land forming the banks of a stream by the deposit of waterborne solids or by the gradual recession of water which exposes previously submerged terrain" and avulsion as "a sudden and perceptible event." Finding that "[t]he June 1912 flood, either separately or in combination with the June 1914 flood, caused a major transformation of the Colorado River in the Mohave Valley," the court concluded the movement of the river's eastern boundary was "caused by avulsion." The court thus ruled Series owned the Property. The court awarded Series attorneys' fees, expert witness fees, and costs under A.R.S. § 12-348(A).

¶8            The State timely appealed and Series timely cross-appealed. We have jurisdiction pursuant to A.R.S. § 12-2101(A)(1).

## DISCUSSION

¶9            On appeal from a bench trial, we review legal questions *de novo* but review the superior court's factual findings for clear error. *Castro v. Ballesteros-Suarez*, 222 Ariz. 48, 51–52, ¶¶ 11–12 (App. 2009). A finding of fact is not clearly erroneous if substantial record evidence supports it, even if there is substantial conflicting evidence. *Id.* at ¶ 11. Evidence is substantial if it allows a reasonable person to reach the superior court's result. *Id.* at 52, ¶ 11. We view the evidence and reasonable inferences from that evidence in the light most favorable to Series as the prevailing party. *See FL Receivables Tr. 2002-A v. Ariz. Mills, L.L.C.*, 230 Ariz. 160, 166, ¶ 24 (App. 2012).

¶10          The State challenges the court's determination that the changes to the river's course, resulting from the 1912 and 1914 floods, constituted avulsion. The State argues the changes amount to accretion. Before addressing the specifics of this case, we review existing Arizona law regarding these two processes.

## I.        Background

¶11          "By congressional enactment, the State of Arizona owns title to the beds of all navigable streams within its borders. . . . Since the Colorado River is not wholly within Arizona's borders, but is, itself, the border, Arizona's title extends from the center of the channel eastward to the river's high water line." *Bonelli I*, 107 Ariz. at 467 (citation omitted). "Beyond argument, title to and ownership of the lands beneath the Colorado River is in the State of Arizona from the Nevada boundary up to the ordinary high water mark in the natural channel as it existed prior to the taming of the river in 1938 by the completion of the Hoover Dam and

the subsequent lowering of the channel by dredging." *State v. Bonelli Cattle Co.*, 108 Ariz. 258, 259 (1972) ("*Bonelli II*"), *rev'd*, *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313 (1973), *overruled by Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363 (1977).

¶12          Our supreme court has addressed the distinction between accretion and avulsion twice before. In *Jacobs*, a criminal defendant challenged whether he could be tried in Arizona for crimes allegedly committed on land near Haughtelin Lake, that before 1920 had been part of the main channel of the Colorado River. 93 Ariz. at 338. The evidence suggested the river "altered its course to the east" in 1920, "forming and flowing through what is now the main channel of the river in that area," but that the crime scene was "never under water." *Id.* at 338–39. Contending that courts presume "changes in the courses of rivers . . . occur by accretion and not by avulsion," the defendant argued the crime scene was in California when the offenses were committed, meaning Arizona lacked jurisdiction to try him. *Id.* at 339. Our supreme court disagreed:

> Accretion is the gradual, imperceptible addition to land forming the banks of a stream by the deposit of waterborne solids or by the gradual recession of water which exposes previously submerged terrain . . . Where, however, as in this case, the stream changes its course suddenly or in such a manner as not to destroy the identity of the land between the old and new channels, the change is termed an avulsion.

*Id.* (citations omitted). The court thus concluded Arizona had jurisdiction to try the defendant. *Id.* at 340.

¶13          The court revisited the distinction eight years later in *Bonelli I*. The Bonelli Cattle Company sought quiet title to lands adjacent to the Property at issue in this case. *Bonelli I*, 107 Ariz. at 466. The evidence presented showed the Colorado River's east bank was approximately one-quarter of a mile west of the disputed land as of 1902 and 1903, but "[n]o evidence was produced as to the course of the river thereafter until 1938," when the Hoover Dam was completed. *Id.* at 467. As noted above, *supra* ¶ 4, the *Bonelli I* court distinguished between avulsion and erosion. 107 Ariz. at 467. Noting it lacked sufficient evidence to determine whether the river's eastward movement between 1903 and 1938 constituted avulsion or accretion, the court stated "in the absence of clear evidence to the contrary, the movement of the river will be presumed to be by erosion." *Id.* at 468.

The court then ruled "[a]s the river moved eastward, engulfing most of Section 3 in the channel of the river, the land to which plaintiff held title decreased so that, by 1938, the owners of the east one-half of Section 3 had, by the operation of natural forces, lost most of it to Arizona." *Id.*

**¶14** On that basis, the *Bonelli I* court directed the superior court to quiet title in the State from the Nevada boundary to the high water mark even though the river had been moved artificially when it was channelized in the late 1950's. *Id.* at 468–69. One year later, the court in *Bonelli II* clarified the State held title "from the Nevada boundary up to the ordinary high water mark in the natural channel as it existed prior to the taming of the river in 1938 by the completion of the Hoover Dam and the subsequent lowering of the channel by dredging." *Bonelli II*, 108 Ariz. at 259.

**II.**      ***Bonelli I* Defines Avulsion Under Arizona Law**

**¶15** The superior court relied on *Bonelli I* to conclude avulsion exists when a sudden and perceptible change occurs. *See* 107 Ariz. at 467. Arguing on appeal for a narrower definition, the State contends, under *Jacobs*, that avulsion occurs "only when the river's channel avulses to an entirely new channel alignment, leaving the prior channel behind and dry land between the old and new channels." But *Jacobs* states that avulsion occurs when "the stream changes its course suddenly **or** in such a manner as not to destroy the identity of the land between the old and new channels." 93 Ariz. at 339 (emphasis added).

**¶16** The State, through Kellogg, also relies on a Bureau of Land Management ("BLM") manual that defines avulsion as a "sudden change in flow alignment . . . to a new channel, leaving an identifiable upland area between the abandoned channel and the new channel." But the manual also notes that "some State courts have established different definitions." And Kellogg conceded that *Bonelli I* established a broader definition that does not require identifiable land between the old and new channels. *Bonelli I* instead stated avulsion occurs when a river moves "so rapidly by floods that [its] banks visibly disintegrate." 107 Ariz. at 467.

**¶17** The State also argues the *Bonelli I* court's reliance on *Nebraska v. Iowa*, 143 U.S. 359 (1892) and *Hirt v. Entus*, 224 P.2d 620 (Wash. 1950) suggest that it intended to apply the avulsion definition identified in those cases. But *Bonelli I* cited *Nebraska* for the general proposition that boundaries move with accretion but not avulsion. *Bonelli I*, 107 Ariz. at 467. And in *Hirt*, the Washington Supreme Court stated avulsion occurs when "a stream . . . suddenly abandons its old channel and creates a new one, or suddenly

washes from one of its banks a considerable body of land and deposits it on the opposite bank." 224 P.2d at 623. Washington's Supreme Court also stated "[t]his **sudden and rapid change** is termed . . . an avulsion, and differs from an accretion in that the one is violent and visible, while the other is gradual, and perceptible only after a lapse of time." *Id*. at 623–24 (emphasis added). Like *Jacobs*, *Hirt* stands for the proposition that a "channel jump" is an example of avulsion but not the only way avulsion can occur. We therefore reject the State's argument that avulsion requires a "channel jump."

### III.        The *Bonelli I* Presumption of Accretion Does Not Apply

**¶18**        The State also contends the superior court failed to apply the *Bonelli I* presumption that "in the absence of clear evidence to the contrary, the movement of the river will be presumed to be by erosion." 107 Ariz. at 468. Notably, it argues Series "never presented any evidence—much less any clear evidence—to demonstrate when and where any avulsion, **as the State properly defined that term**, had occurred within the Mohave Reach at or near the Subject Property." As discussed above, the State's proffered definition is inconsistent with *Bonelli I. See Bade v. Ariz. Dep't. of Transp., Motor Vehicle Div.*, 150 Ariz. 203, 205 (App. 1986) ("This court is bound by a decision of the Arizona Supreme Court and has no authority to overrule or disregard it.").

**¶19**        We also note the *Bonelli I* court applied this presumption because it lacked evidence to determine "whether the eastward movement of the Colorado River between 1903 and 1938 was by avulsion or erosion." *Id.* at 467. That is not the case here. Burtell compiled historical accounts between 1858 and 1916 that "depict a river whose channel shifted quickly and widely following flood events." He also opined the 1912 and 1914 floods likely transformed the Colorado River "from a relatively narrow meandering system to a broad shallow system," widening it from approximately one-quarter of a mile to "something well over a mile." He testified these floods were "extraordinary," citing downriver gauge data that suggests each flood generated approximately ten times the typical or median flow. He also cited 1915 survey notes indicating the river was rapidly cutting to the east and that all boundaries and survey monuments placed nine years earlier had been "obliterated by the river."

**¶20**        On this evidence, he opined the changes to the river's course were sudden and rapid:

[E]ven though the banks of the river in the Mohave Valley are relatively erodible—sands, gravels, and silts—there's also vegetation on them that provides some anchoring. But when you have so much flow for so much time, it's kind of like testifying in a court trial. The pressure just constantly on you, it's going to erode those banks. And this river system, when you have 20 days of flows that are greater than 10 times the typical flows, it's putting such an extraordinary stress on the banks of the river and whatever's trying to hold the banks, and after a while something's going to give. And in my opinion this river system, because it was rising up, it was alluvial, it was prime to change, and we—we—Mother Nature hit it with two very large floods of high magnitude and high duration.

And in my opinion the system transformed based on all that. It was a remarkable change agent.

¶21        Kellogg largely agreed the 1912 and 1914 floods caused the Property to become submerged but opined the changes to the river's course should be classified as accretion. Yet his opinion hinges, on the same narrow avulsion definition the State argues for on appeal. Indeed, the 1977 study Kellogg cites as evidence that no avulsive changes occurred, described avulsion as a process "in which the river abandoned its bed and sought a new channel with undisturbed lands lying between." Again, *Bonelli I* draws the line between accretion and avulsion elsewhere. 107 Ariz. at 467. And the superior court has broad discretion to resolve conflicts in expert witness testimony. *See In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source*, 198 Ariz. 330, 340, ¶ 25 (2000) ("The trial court . . . weighs the evidence and resolves any conflicting facts, expert opinions, and inferences therefrom.").

¶22        Kellogg also opined Series had to establish where the OHWM was immediately before and after the avulsive change to show avulsion. But he conceded that neither *Bonelli I* nor any other case establishes these "general guidelines" or requires a party to pinpoint when the avulsive event began or ended.

¶23        The State also cites Arizona and federal cases addressing the area around Yuma to suggest that only one avulsive event had been previously found. *See Jacobs*, 93 Ariz. at 339 (avulsion); *Beaver v. U.S.*, 350 F.2d 4 (9th Cir. 1965) (accretion); *State v. Gunther & Shirley Co.*, 5 Ariz. App.

77 (1967) (accretion). Whether avulsion occurred approximately 200 miles downstream from the Property has no bearing on whether the 1912 and 1914 floods caused avulsion near the Property.

¶24        For these reasons, we affirm the judgment in Series's favor. We need not address Series's argument that the "equal footing" and "public trust" doctrines, under which the State holds sovereign title to navigable riverbeds, no longer apply to the Property because it has been "dry land" since channelization. *See, e.g., Ariz. Ctr. for Law in the Pub. Int. v. Hassell*, 172 Ariz. 356 (App. 1991).

**IV.        Attorneys' Fees, Expert Witness Fees, and Costs**

¶25        The State contends Series cannot recover attorneys' fees under § 12-348(A)(1), citing *Lange v. Lotzer*, 151 Ariz. 260, 262 (App. 1986), for the proposition that § 12-1103(B) is the exclusive basis for awarding fees in a quiet title action. *Lange* involved a fee award under § 12-341.01(A), which states it "shall not be construed as altering, prohibiting or restricting present or future contracts or statutes that may provide for attorney's fees." *See id.* at 260; *see also* A.R.S. § 12-341.01(A). That statute, which is not at issue here, is subordinate to other fee statutes. *See Lange*, 151 Ariz. at 262; *see also Lacer v. Navajo Cnty.*, 141 Ariz. 392, 395 (App. 1984).

¶26        Section 12-348(A)(1), in contrast, states the court "shall award fees and other expenses to any party other than this state or a city, town or county that prevails by an adjudication on the merits in . . . [a] civil action brought by this state or a city, town or county against the party." A.R.S. § 12-348(A)(1). In enacting § 12-348, the Legislature expressed its intention to "reduce the deterrents and the disparity" of defending claims brought by the State "by entitling prevailing parties to recover an award of reasonable attorney fees, expert witness fees and other costs." *Roubos v. Miller*, 214 Ariz. 416, 419, ¶ 16 (2007) (quoting 1981 Ariz. Sess. Laws, ch. 208, § 1). We give the Legislature's declaration "special consideration because express legislative findings are quite rare in Arizona." *New Pueblo Constructors, Inc. v. State*, 144 Ariz. 95, 112 (1985). As such, "[s]o long as the litigation falls within one of the categories of subsection A and is not excluded under subsection G [now subsection H] an award of fees is proper." *Cortaro Water Users' Ass'n v. Steiner*, 148 Ariz. 314, 317 (1986).

¶27        No such exclusion applies here. *See* A.R.S. § 12-348(H). If the Legislature intended to exclude quiet title claims from § 12-348(A)(1), it would have done so. *Lacer*, 141 Ariz. at 403. We therefore affirm the award.

**¶28** Series requests its attorneys' fees incurred in this appeal under A.R.S. § 12-348. For the reasons set forth above, Series may apply to recover its reasonable and necessary attorneys' fees under ARCAP 21. *See* A.R.S. § 12-348(I)(1).

## CONCLUSION

**¶29** We affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA